STATE, Plaintiff, vs. CATLIN, Defendant.

*October 11—November 5, 1957.*

For the plaintiff there were briefs and oral argument by *Harlan B. Rogers,* counsel for the Board of State Bar Commissioners.

For the defendant there was a brief by *Rieser, Mathys, McNamara & Stafford* and *Murphy, Gavin, Stolper & Desmond,* all of Madison, and oral argument by *Stephen E. Gavin* and *Robert M. Rieser.*

PER CURIAM. Mark Catlin, Jr., was forty-five years old at the time of the hearings and resides in Appleton, Wisconsin. He was admitted to the bar of this court in June, 1933. He is married and has three children. He has been elected seven times to the assembly. He served in the 1937, 1939, 1941, 1943, 1949, 1953, and 1955 sessions. He was majority

leader in a portion of the 1939 session and in 1941 and 1943. He was assistant majority leader in 1949, majority leader in 1953, and was elected speaker in 1955. He served in the Marine Corps from 1943 to 1946.

The complaint is in four counts. All allege that defendant induced or led various people to believe that he possessed influence in pardon or parole matters; that he accepted money from people who had the corrupt intention of influencing official conduct; and that defendant knew of such intention. In two counts it was alleged that defendant caused other attorneys to appear at hearings on pardon matters and defendant did not appear openly as an attorney. Further details of the transaction involved in each count were alleged.

Count I relates to the defendant's representation of Louis Fazio in a pardon matter; Count II to his representation of Americo DePietto in a parole matter; Count III to his representation of John and Jerome Mandella in a pardon matter; and Count IV is a general allegation with reference to parole and pardon matters of the individuals named in the first three counts and others.

The pleadings are in detail as are also the findings and the exceptions and objections. We are of the opinion that some of the findings are subject to qualification and correction in particulars which are not of great substance or materiality. We see no purpose, however, in formal amendment of them and therefore will state the material facts disclosed by the record as succinctly as possible.

Defendant had represented an applicant for pardon early in his career as a lawyer and thereafter had represented a number of applicants for parole or executive clemency. He acquired familiarity with the records and procedures of the division of corrections and of the prison and became acquainted with many of the employees of the division. He visited clients in prison on a number of occasions and in some cases had called for them personally when they were

released. His services in parole matters included his visits to the men, his examination of their records, and informal conferences with staff members of the division of corrections. In these conferences he brought facts to the attention of the director of the division or employees who would probably sit on the parole board. The parole board does not permit the appearance of attorneys at their hearings. The practice of the prison authorities is to discourage prisoners from employing counsel on the ground that no attorney is able to do very much for them and that the matter is decided upon the record made by the prisoner himself.

In pardon matters also the defendant visited his clients on occasion, examined their records, and conferred at times with the trial judge or district attorney in the hope of obtaining their favorable recommendation. Pardon applications are heard before the governor's pardon counsel. Notice of hearing is given to the trial judge and district attorney and is published. The attorneys for the applicant are permitted to appear. After hearing, the pardon counsel makes a recommendation to the governor. The governor acts upon the recommendation, ordinarily without any further hearing, and as a matter of policy generally avoids granting interviews to representatives of the applicants. Defendant customarily arranged that some other attorney appear at the hearing before the pardon counsel and defendant would discuss the merits of the applications with the governor on other occasions. As majority leader, elected by the same political party as the governor, and later as speaker, he had ready access to the governor and would interject his remarks in favor of his pardon clients into discussions which were primarily on other business.

Defendant did perform services for some of his clients such as arranging for a job or contacting the client's family. Defendant obtained substantial fees. Some were on a contingent basis, for example, $500 paid while the client was still in

prison and $1,000 paid upon release. Aside from the evidence under the first three counts, there were four instances in each of which a total fee of $1,500 was received, and another instance in which a total fee of $1,000 was promised, but only the $200 initial payment made. In other instances there were smaller fees.

Defendant maintained no office files of any kind with respect to nearly all of his parole and pardon clients. In no instance had defendant been the man's attorney at his trial.

Counts I and III related to the Fazio—Mandella group. Louis Fazio, John Mandella, Jerome Mandella, and Dominic Lampone were convicted of murder in 1946. Former Judge A. J. Hedding of Milwaukee presented several applications for executive clemency on behalf of these prisoners. Requests had been made of defendant to interest himself, but prior to 1953 he had declined. In December, 1953, he indicated, upon request by Hedding, that he had again checked the record of Louis Fazio and found it good. He agreed to work for Louis in the background if the Fazios would pay $5,000 in advance and promise $5,000 more upon Louis' release. On January 8, 1954, Louis' brother, Frank, paid $5,000 in cash to defendant and Judge Hedding. No receipt was given. Defendant took $4,000 with him and left $1,000 with Hedding, who had been working on the matter without receiving compensation. Frank testified, and the referee found, that defendant assured him that Louis would be freed on the second application if not the first.

Applications for executive clemency for Fazio were heard on March 18th, and November 18, 1954. Judge Hedding had died in February, but his son and associate, James, prepared the petitions and presented the matter at both hearings. The first application was denied by Governor Kohler a few days after the hearing. Defendant had told Charles Totto, the pardon counsel, that defendant wanted to discuss the

matter with the governor after the hearing, but no opportunity was afforded him. After the hearing on November 18th, defendant approached the governor, urged clemency, and became involved in an argument with the pardon counsel (Edwin Wilkie) as to the attitude of the trial judge toward clemency for Fazio. On November 20th, the governor denied the pardon.

In early 1955, defendant discussed the matter with the governor and the governor indicated he could not give favorable consideration to Fazio without doing something for the Mandellas and Lampone. After that, Dominic Mandella approached defendant and agreed to pay him $4,000 for representing Dominic's brothers, John and Jerome. An additional $1,000 was to be paid for release within one year. Defendant had previously declined to represent the Mandellas. Dominic paid nothing at the time of the agreement, but made several payments within two months totaling $725. These payments were in cash except for an $80 check payable to Dominic and indorsed by him. No receipts were given.

It seemed to everyone that Lampone had the most meritorious case for clemency and petitions were prepared for Fazio, the Mandellas, and Lampone although Lampone had not retained defendant. At defendant's request and without compensation, a Madison attorney had his secretary prepare petitions and notices by copying the previous ones on file in the executive office. These applications, together with that of Peterson, another of defendant's clients, were presented at a hearing by another attorney, who acted at defendant's request and received nominal, if any, compensation. The hearing was May 19, 1955. No recommendation was ever made by the pardon counsel. It was at approximately this time that the governor testified he told defendant, "You know that if you are representing a client for money there is a rule in this office that it is automatically denied."

On at least two occasions during the summer of 1955, defendant talked to the governor about clemency for the Fazio group. Two of the Fazio brothers had received some unfavorable publicity. On one occasion defendant gave the governor a newspaper clipping showing that Frank had received a "clean bill of health" from the police in connection with an application for a liquor license. Later he handed the governor a press release which he had prepared. It was in the form of a statement which he proposed the governor make in justification of the commutation of sentence desired for Fazio, the Mandellas, and Lampone.

On October 21, 1955, Anthony Fazio telephoned defendant on behalf of the Fazio and Mandella families and discharged defendant. Defendant told him they were making a mistake. Immediately defendant called upon the governor and told him about the development. Defendant then telephoned Anthony and reiterated that they were making a mistake.

The Fazio family had begun to be dissatisfied after the second denial in November, 1954. They had complained to Alan Hubanks, executive director of Wisconsin Service Association, a charitable agency interested in the welfare of prisoners. In January, 1955, Hubanks had conferred with defendant to get his side of the story and had asked about the claim of a large fee, paid in cash, without a receipt. Defendant had apparently avoided giving direct answers to Hubanks and Hubanks had reported back to the Fazios. Fazios again complained to Hubanks in October, 1955. He relayed the complaint to Wilkie and the governor and was present when Anthony Fazio telephoned defendant and discharged him. Wilkie then investigated the matter at the governor's request and the governor later referred the results of the investigation to the Board of State Bar Commissioners.

There is a conflict in the testimony as to the point at which the governor learned that defendant was representing pardon applicants for compensation. It was defendant's position that

the governor had known ever since a particular matter in 1952 that defendant was attorney for various applicants and that he had other attorneys appear at the hearings in order to conceal defendant's interest in the matter from the newspapers and to avoid embarrassment. The governor testified that in the 1952 matter he had understood that defendant's interest in the applicant was altruistic, presumably that defendant was urging favorable consideration as a matter of public interest as a legislator. He testified that only from November, 1954, and on, had he had a "dawning realization" of the defendant's true interest in the pardon applications then pending. Whatever the governor's understanding, his pardon counsel evidently assumed that defendant had been retained by the various applicants.

Count II related to DePietto's application for parole. Americo DePietto entered the prison in the summer of 1954, serving a federal sentence concurrently with a state sentence. He would be eligible for parole under state law in July, 1955, and desired parole even though he would then be placed in a federal institution, not being eligible for federal parole until the spring of 1956. Someone in the prison informed him of defendant's name and address and DePietto made contact with defendant through DePietto's girl friend, Joyce. Defendant called on DePietto and checked his record. He conferred with the director of the division of corrections and it was suggested that it would be better to have the application deferred until DePietto was eligible for federal parole, for it would then be possible for state and federal authorities to parole him on a joint basis. Defendant called on DePietto and this idea was satisfactory. A fee of $1,000 was agreed upon and DePietto said he would have Joyce pay it. By phone, Joyce and defendant arranged a meeting at the airport in Chicago, and on June 27, 1955, defendant flew from Madison to Chicago and return and received $100 in cash and a $400 check. Joyce claimed that the arrangement was that the

other $500 was to be paid when parole was granted; defendant testified to the contrary. On July 13th, DePietto appeared before the parole board and wrote a letter to Joyce telling her that he had appeared. On the 17th after a telephone call between Joyce and defendant she mailed defendant the $500 balance. The referee found that Joyce paid the $500 balance to defendant upon his assurance that everything was in order and that the parole would be granted either then or the following May. Because, however, one of the employees of the division of corrections, who knew of the arrangement for deferment which defendant had worked out with the director of the division, turned out not to be present at the meeting of the parole board, the parole was denied so that a further application could not, under the rules, be made until July, 1956.

Defendant cashed the $400 check at a business establishment in Milwaukee and cashed the $500 check at a bank in Appleton where he did not have his account.

As previously referred to, defendant had a client named Peterson whose application for pardon was heard at the same time as the last applications of the Fazio group. In the course of Wilkie's investigation in early 1956, he interviewed Peterson. Peterson denied that he was represented by defendant. Later, after conferring with defendant, he again denied it. Peterson and defendant both testified at the hearings that defendant had urged him to tell the truth. Shortly after the second denial, however, at an angry conference in the executive office, defendant had admitted he told Peterson to lie because he "didn't want it to be embarrassing."

It must be pointed out, as found by the referee, that defendant did not attempt to use any corrupt means in behalf of his clients.

We conclude that defendant substantially violated important standards of professional conduct. ·

He concealed his activity as attorney for applicants for executive clemency. His dispute with the governor is only whether he concealed his attorneyship from the governor. He asserts that he intended to conceal it from the public in any event. Whether legislator or not, whether influential or not, a lawyer has a duty to act openly as such when he appears before an official. The constitution gives the governor absolute and arbitrary power to grant or deny clemency. This unrestricted delegation of power does not make clemency a private matter. It is of great concern to the public. Deliberately to arrange for another attorney to appear alone at the hearing before the pardon counsel, and then to appear secretly before the governor as an advocate, is unprofessional conduct by a lawyer.

Canon 26 of the Canons of Professional Ethics provides in part as follows (p. 18) :

"A lawyer openly, and in his true character, may render professional services . . . in advocacy of claims before departments of government, upon the same principles of ethics which justify his appearance before the courts; but it is unprofessional for a lawyer so engaged to conceal his attorneyship, or to employ secret personal solicitations. . . ."

Defendant, as an attorney who was also a legislator, had a duty to disclose his attorneyship to the parole officials with whom he dealt in the clearest possible terms. Legislators frequently bring the problems of individuals to the attention of administrative officers. Sometimes this is done at the request of a constituent, sometimes not, but there is an implication that the legislator is not personally interested in the matter and considers that he is acting in what he conceives to be the public interest. If, in fact, he is advocating a client's cause as a lawyer, he must certainly make

that plain to the official with whom he deals. He must not rely on a mere assumption that his attorneyship is apparent.

We conclude that defendant's relationship with the governor made it unethical for him to appear as an attorney on pardon matters. In other words, even full disclosure, in his case, would not sufficiently remove the conflict of interest. Defendant was majority leader in the assembly in 1953 and 1954. He was speaker in 1955. His influence in shaping and enacting legislation was great. He was important to the governor and they worked closely together on many parts, at least, of the governor's legislative program. His access to the governor was almost at will and his visits frequent. In all legislative matters the two men were collaborating in what they conceived to be the interest of the state and the public. Could the defendant, under these circumstances, properly accept a retainer which would compel him to turn to the governor on occasion and say, "I am now representing my client and not the public, but I think it is in the public interest to commute my client's sentence so that the parole board can let him out of prison?" We think not. The record shows that defendant's advocacy of clemency for the Fazio group was frequent and generally a part of a conversation in which the defendant was participating in his public-interest character. By accepting the retainer, defendant placed himself in a position where either his duty to the client or his duty to the governor and the public, or both, would almost certainly suffer. Because of the relationship of trust and confidence between defendant and the governor, in a politic if not technical sense, defendant should have rejected any retainer in pardon matters. He compounded the vice by the concealment from the public to which we have already referred.

One fact which was not included in the findings of the distinguished and learned referee, but which we find from

the record, is that Frank Fazio, Dominic Mandella, and DePietto and Joyce thought they were buying influence in addition to purely legal services and that defendant was thoroughly aware of that thought. Only some of the Fazio brothers and Joyce testified to express representations by defendant that he had influence because of position, friendship, or favors owed him. But their testimony is not inherently incredible. Actions, however, clearly show that these clients believed they were to have the benefit of influence and that defendant was trading on the belief. Many of the fees received by defendant appear to have been larger than the legal services rendered and expenses incurred might justify, and the size and proportion of the part of the fee which was contingent upon release from prison bordered at least, on the improper. Specifically, however, the Fazio fee ($5,000), the Mandella fee ($4,000 plus $1,000 upon release within a year), and the DePietto fee ($1,000), when compared with the services to be rendered are weighty evidence that payment was not being made for defendant's services solely in the character of a lawyer. Considering the additional facts that the Fazio and Mandella payments were made in cash except for an $80 check; the DePietto payments were $100 cash and the balance in checks which were not deposited in defendant's bank account; no receipts were given; and defendant deliberately avoided public knowledge of his interest in the pardon applications, we cannot but find (even if there were no testimony of express representations) that the clients thought they were buying influence and defendant knew and took advantage of that thought.

If, as claimed by defendant, he was retained on June 6th, by DePietto for $1,000, to be paid by Joyce, and if the transaction was proper in all respects, there would be no reason for defendant's expense and inconvenience in flying to Chicago and back on June 27th for the purpose of collecting the

money. His action supports Joyce's testimony that defendant would rather have had cash than a check. The desire to avoid making records of these transactions whenever possible is evidence that defendant considered the transactions improper.

The referee, for whom we have the greatest respect, recommended a reprimand and fine and stated he did not recommend suspension. We have concluded, however, that there must be a period of suspension.

Disciplinary measures must be sufficient to express, by deed as well as word, judicial disapproval of the misconduct found. Anything short of suspension would fail to meet that standard in these circumstances. Defendant has insisted throughout this proceeding that he did nothing wrong. He has suggested that the governor initiated the investigation because defendant had announced his candidacy for United States senator and that the Board of State Bar Commissioners hurriedly filed the complaint so that it would be on record before the party convention to which defendant intended to present his candidacy. Defendant certainly offers no contrition in mitigation of punishment.

In fixing a rather short period of suspension, we give weight, as did the referee, to the fact that defendant made no attempt, nor had any intent, to corrupt any of the officials of the state with whom he dealt and that he did confine his discussions to the merits of the cases. In our judgment, the public interest requires a suspension for six months and payment of $1,500 toward the costs of the proceeding.

It is therefore ordered and adjudged that the license of defendant, Mark Catlin, Jr., to practice law be suspended for a period of six months from the date of entry of this order, and for such period thereafter as shall expire before his license is restored; and that within thirty days from the date of entry of this order, defendant shall pay to the state treasurer the sum of $1,500 toward the costs of this proceeding.

Restoration of defendant's license shall be conditioned upon compliance with Section 6, Rule 10, State Bar Rules, payment as herein ordered, and satisfactory proof that during the term of suspension, defendant has not practiced law in this state, has not held himself out as licensed to practice law as an attorney in this state, and has in no manner represented applicants for pardon or parole in this state.

WINGERT, J., took no part.